L.L.C., counsel, you may proceed. May it please the court, Robert Izzard for the appellant. The appellant asks that the court reverse and remand with instructions to deny the motion for summary judgment. We believe that the district court made findings that were inconsistent with summary judgment. At the hearing on the motion for summary judgment, the court and the defendant and the plaintiff all agreed that exorbitant rates are bad faith. And you can see that at the transcript of the hearing at pages 42 to 43 at 57. In the ruling, the judge said there was a genuine issue of fact as to whether the defendant's rates were exorbitant. And we think by that simple colloquy and ruling alone that summary judgment should not have been entered. We think the issue really arose because the court was confused about our theory. The court conceded that there were, or at least found in the ruling, that there is a genuine issue of material fact as to the meaning of the term business and market conditions. But the court said no finder of fact could ever conclude that business and market conditions implied a particular margin above the wholesale rate, in this case $13. But they do imply, didn't he find or doesn't common sense tell us, that there's some relationship to the market cost and the price charged? Absolutely, that is our theory. But that was not the basis of the ruling. The basis of the ruling, and I think you could see this in the ruling at special appendix page 46, was that no fact finder could conclude that the contract requires a specific profit margin. And I think in reaching that conclusion, the judge confused our damage theory. And our damages are based on the principle that there should be a $13 per megawatt hour margin. So that's our damages analysis. $13 over and above what direct energy pays? Yeah, the procurement. Their cost. Their cost of goods sold. Yes, but that's our damage model. You know, we rely on, for example, story parchment, which is the Supreme Court case that talks about, you know, when you put together a damage model, you give your best estimate. And we use $13 an hour as our best estimate based on the direct energy's own numbers regarding margins. That's not our liability theory. But if people could leave this contract anytime it becomes oppressive, how can we give you relief? Well, the question is, do you know it's oppressive, and when can you leave? What do you mean, do you know it's oppressive? You know what you're paying, don't you? Well, you know what you're paying. But if your rate is a variable rate that fluctuates above direct energy's procurement cost, you don't know what direct energy's procurement cost is. It's not public information.  Well, I think if you read the- You say, wow, I can't believe this bill is so high. And that's when you investigate. Isn't it true? Well, when you say investigate, what do you investigate? You know, I think it's a lot to ask a consumer to be an expert on the wholesale energy markets because we're talking average consumers. And, in fact, defendant's expert himself, Mr. Fisher, said that they basically take advantage of the fact that customers don't pay attention. And you could see that in Mr. Fisher's report at Confidential Appendix, page 250. But the point is, that's a mitigation issue, Your Honor, in my opinion. And so mitigation first is not on the table now. And before you have a duty to mitigate, there's an issue of you have to have proper notice of whether there's a potential claim. Thinking your rates might be too high I don't think is enough to trigger a mitigation. What's the basis for saying that business and market conditions should be limited to procurement costs to begin with? Well, it's not business and market conditions in the abstract. It's business and market conditions that change, that could cause a rate to change. And our experts have testified, and, again, we think this is a jury issue, our experts have said that the only material variable factor is the wholesale rate. You step back and look at Direct Energy's business. They don't make anything. All they do is they trade power back and forth. They buy- They're middlemen. They're middlemen. And so their costs are relatively fixed. What do they do? They have rent. So they have a five-year lease for a building. That's not going to change. That's not going to cause the variable rate to change. The only thing- They have fixed costs and then the cost of the power they purchase. Exactly. And they're entitled to profit over that. Absolutely. Your argument is it can't be unlimited profit? Well- It has to be reasonable profit? Where does that come from? It comes from the implied covenant, Your Honor. If you look at the Sadowski case, at least in Connecticut, what the implied covenant does is it puts in a good faith term to avoid an illusory contract. If Direct Energy can charge anything it wants, then the contract does no meaning. In the case law, I think it's pretty clear that says when somebody's exercising discretion, they have to exercise it within the bounds of the reasonable expectations of the parties. But it wasn't at the party's discretion for the first year. Right. I mean, they have a fixed rate and then there's a pretty clear provision, it seems to me, after the initial term and during the renewal period, the rate for electricity will be variable each month at Direct Energy's discretion. Correct. So you're saying if we interpret that to mean at their unlimited discretion that this was not a contract? I believe it would be an illusory contract. Let's say, hypothetically, Direct Energy says I want to charge you a million dollars a kilowatt hour. You can't do that. The case law is pretty clear that under the implied covenant, it has to be, when you have discretion, it has to be within the reasonable expectation of the parties. And I believe, and I think the district court found, that there's no conceivable reason that somebody would enter into this contract if they didn't think they could ultimately save money. And the defendant's expert says every single month, every single month the rate was above the guaranteed fixed utility rate. So it's my view that if a party knew that, if a consumer knew that, they wouldn't sign up for it. And that, to me, is beyond the reasonable expectation of the parties. And that's what the district court said on the motion to dismiss. And yet 50% of the customers of Direct Energy are on variable rates. Exactly. How do we explain that? Well, I think their expert explained it, Your Honors. I mentioned a while ago, if you look at his report at Confidential Pet Ex, page 250, he says what happens is people sign up and they don't pay attention. And so they wait and wait and wait. And, you know, there's a structural issue here, too, because you buy the power and even if you were incredibly vigilant, it would be a month and a half between the time you got the power and you could have discovered that you were being overcharged. So that's for the most vigilant person. So there's a structural advantage for every customer. Even people stay on for years after their variable rate, after their fixed rate contract expires. That's very true. And, you know, I have a fixed rate, but you know what? I never look at my energy bill. And their expert says that's what they take advantage of. There are a lot of people who leave. Most people would tell you you're crazy to be on any of these contracts. You should be on the fixed utility rate because the utilities don't earn a profit. So utilities, by definition, long term, are going to give you a better deal. But the marketing plans of these variable rate suppliers say, you know, we'll save you money, and you sign up, and you know what? You never save money because, as their expert says, the longer you stay on the variable plan, the more money you're going to lose. You know, these statutes allowing alternative energy suppliers were enacted with great hope that it would bring down the cost of energy to ordinary consumers. Why did it fail? Well, I think the problem was there was a structural issue because they forgot the part that, at least in Connecticut, the utilities buy at a market rate because there's an auction. And the utility buys at a six-month market rate, and they earn no profit. So I think the hope probably didn't match the economic realities, and perhaps if the legislature thought this through, they might have come to a different result. I know in Connecticut now, you know, they don't market these variable rate plans anymore for precisely the reason we're here. It's turned out to be a real burden on consumers. Thank you. You've reserved two minutes for rebuttal. Thank you, Your Honor. We'll hear from Direct Energy. May it please the Court. Matt Matthews on behalf of Direct Energy, the Apple E. Many of your documents are under seal, your pricing strategy, but isn't it true that your pricing strategy is you'll charge whatever the market will bear and damn the consumers? No, Your Honor. Tell me why not. It's not. Our pricing strategy is we offer fixed-rate plans. That's all we sell in Connecticut and all we ever have sold in Connecticut. And what happens when the fixed-rate contract expires? Then it goes to a variable rate that changes month to month based on business and market. And on that rate, isn't the rate whatever the market will bear? No, Your Honor. We take into account, as our corporate representative detailed in his deposition, customer retention is one of our main goals. And if we charge a rate that is higher than the customer can bear, higher than the market would bear, higher than we think is fair for our business and for the customer, then those customers will leave. Those customers are the company's biggest asset. Who are your competitors in Connecticut? There are a number of different what's called ESCOs in Connecticut, the energy supply companies, and there are dozens and dozens who are licensed to do business there. So if I don't like direct energy, I have alternatives? Yes, Your Honor, absolutely. The first alternative would be the utility, and anyone is free to stay with the utility. But in addition to direct energy, there are dozens of energy supply companies that a customer could go to. And the Connecticut Public Utilities Regulatory Authority has set up a website where customers can compare prices and look at historical pricing for these companies and decide which is the best deal for them. But it's true, isn't it, that most customers not only don't go to the website of PURA or focus on their bills but just pay whatever the bill is, and you wind up charging whatever the market will bear? Your Honor, I don't know anything about how frequently the consumers go to the website, but I can tell you- Well, 50% of your customers, when their fixed rate contract expires, stay on the variable rate in which they pay much more than the costs to you of procuring that energy. It must tell us that they're not looking, they're not paying attention. They may not be, but we go to great efforts to try to get them to come back. And our corporate representative to a fixed rate, before their contract expires, we send out a notice letting them know that the contract is going to go variable and encouraging them to call in and renew at a fixed rate. And then after they go to a variable rate, we frequently send them letters, again, encouraging them to come back, especially at times where we expect price increases like the polar vortex. We send out letters in advance of those trying to get customers to come back to the fixed rates. And the reason that Direct Energy only sells fixed rates and would prefer customers to be on the fixed rate is there's a commitment from both sides. You can plan. You can plan. You can plan ahead. You can hedge your power purchases ahead of time so that you know how many customers you have. You know about how much power they're going to use. And you can plan for that and run your business more predictably and more efficiently. When customers are on variable rates and can leave at any time, that's much harder to do. But your whole notice system appears to fail if 50% of the people who were originally on fixed rates stay on variable rates. They're not getting notice that you're charging whatever the market can bear. One, Your Honor, I would, again, submit that we're not charging just whatever the market can bear, that our prices are constrained by business and market conditions. Judge Bolden looked at the conditions that we consider, which Mr. Richards at the lower court said were our costs, our margin targets, the term of the contract, and our customer retention goals. And he found that under any reasonable reading, those were business and market conditions. We are constrained by those. For fixed rate customers, the margin is $13 per kilowatt hour, right? Megawatt hour. That's right. But you have charged as much as $45 per megawatt hour on the variable rate? Yes. For the variable rate customers, correct? Correct. Is that what the market can bear? No. The reason we do that is- Maybe it could go even higher. No, I think it would depend on the circumstances. But the reason that they do that is what I talked about, the additional risks that they have with the variable rate customers. And the fixed rate customers are more predictable and easier to plan for. But direct energy's rates are bounded by this discretion. As an example of not charging whatever the market will bear, I'd point you to the polar vortex. The polar vortex is really what got this lawsuit started. Consumers saw their prices spike, and some people who maybe never paid attention to their bills did. Well, during that same time period, when other competitors shot their rates up by 200%, direct energy held them down and lost money, lost tens of millions of dollars in January and February of 2014. And those months, which actually started this lawsuit, are a credit in their damages report prepared by their expert because of all the money direct energy lost at that time. So I think that's a good example of direct energy not just charging whatever the market will bear. Did you make it up by raising rates in the warmer months when energy was cheaper for you to buy? They did make some of that up, and I would submit to the court that that's a good thing, not just for direct, but for the consumer. It prevents the consumer from having to bear the full weight of those price spikes in those cold months when underlying wholesale prices have spiked by 200%. Did customers during the polar rate pay less than buying energy from the power company? Yes. Because they were fixed rate? Because they were fixed rate and because the wholesale rate, I want to be clear, the rate that I'm talking about is the one that's in their complaint, the day ahead locational marginal price reported by New England ISO. And that rate at that time was equal to the variable rate that direct energy charged. So direct energy didn't even charge more on the variable rates during that time period. On the fixed rates, they vary depending on when people signed up. You couldn't afford everyone to look at their bill and say what's going on, correct? So you had to tip off the top of the curve, didn't you? I'm sorry. I missed the first part of the question. I'm sorry. You couldn't afford all customers to look at their bill and say what's going on, so you couldn't raise the rates as high as your cost might have dictated. I think the bad motives that Ms. Richards attributes to that pricing strategy are unfounded. And the expert, the testimony that they cite, he did not admit or concede that direct energy relies on people not looking at their bills. He was asked a question about why would anyone, if they looked at their bills and they saw that it was more than the utility rate, why would they stay? And he said they probably wouldn't if they looked at their bills. But there's no testimony in the record from direct energy expert, much less its corporate representative, that direct energy relies on some sort of inaction on customers' parts, or that it does anything but repeatedly try to get them to come back to fixed rates. I'm not accusing direct energy of having a bad motive. I just think this was an idea to bring in competition that failed because you have no incentive not to charge whatever people will pay. And then customers who are not, I think the statute protects customers who are unthinking, ignorant, and credulous. That's your load of customers, and we can't protect them, but the statute does. That's CUTPA. Your Honor, again, we don't sell variable rate contracts. We've never tried to lure people in with variable rate contracts or teaser rates or anything like that. We sell fixed rate plans, 12 months to three years. And as I said, we try to keep the customers on those fixed rates. We don't lure them in, and we don't take advantage of them. And I think your point— Let's say I get flipped over to a variable rate. How long am I locked into that? You can leave it any time you want. You're not locked in at all. In fact, in this case, Mr. Richards wasn't locked into his fixed rate contract. He could have left during that time as well, and he tried to. So he could open your mail, look at your bill, pick up the phone, and get another provider. That's correct, Your Honor. The original plan is one year. Did you mention just now you also have a 12-year fixed rate plan? 36 months. I'm sorry. If I said 12 years, I misspoke. That's far longer, three years. So are there other terms for the fixed rate plan? It can be 12 months, two years, three years. I think in some markets there may be different terms, but those are the ones I'm aware of in Connecticut. And yet I continue to be struck by the fact that most customers stay, or at least half of them stay, after the fixed rate expires. We would love it if they all came back. And when Connecticut decided to ban variable rates, Direct Energy was there in support of that bill because our strategy has always been in Connecticut to sell fixed rate plans only. We don't believe our competitors can do that, but we can, and that's our preference. We're glad that legislation was passed. So I think Mr. Richards' claim, in order for you to fine for him- His claim is that this isn't really a contract. It's illusory because you could set the price at whatever rate you want to. It's not, though, at least because of the first year in which he received a fixed rate. So even if he's right about everything, and I don't think he is because I think we're still bounded by business and market conditions, but even if he's right that the variable rate period has some illusory quality, the contract itself is not illusory because he got the first year fixed rates. And the authority in this circuit is that a partial illusory quality doesn't render the whole contract illusory. But, again, I don't think the contract's illusory at all. I think business and market conditions is a reasonably clear phrase. Judge Bolden found that everything that we consider under any reasonable reading is a business and market condition, and that Mr. Richards' attempt to impose an appropriate margin on top of one business and market condition, singular- Wouldn't the ordinary consumer, when they hear that the rate is set according to business and market conditions, wouldn't the ordinary consumer think that the rate of being charged has something to do with business and market conditions, and yet it doesn't always in your pricing of variable rate energy? I think it does. I don't think there's been any evidence of any time period in which our rates did not follow business and market conditions. The only business and market condition that matters in Mr. Richards' reading of the contract, which would essentially have you rewrite the contract, is the cost to procure just the power that sold the variable rate customers, not the cost of running the other parts of our business, our fixed-rate business, not what other competitors are charging. In fact, he would say it doesn't even matter if direct energy is charging less. Direct energy may be the most efficient company in the market. It may have the lowest rates in the market but the highest margins, and under his reading of the contract, that would be unfair. And I think that that's not just going to require a rewriting of the contract, but it really asks the court to regulate something that the Connecticut legislature . . . It's unlikely that you'd have the lowest rate and the highest margins. Isn't it unlikely? I don't know, Your Honor. But I think it's possible under his reading of the contract, and I think that's in part why Judge Bolden found that that one reading, that one market condition, he's written business conditions out of the contract. That one market condition is something that no reasonable juror could conclude business and market conditions met. Thank you. Thank you, Your Honor. Mr. Robinson, you've retained two minutes for a rebuttal. Yes, thank you, Your Honor. Just as a quick point I forgot to mention before, I want to alert the court to the fact that the standing issue, the class standing issue was argued before another panel in Langen v. Johnson & Johnson in early February. In this court? In this court. So, I thought I would just pass that on. I'd like to talk a little bit about this argument that direct energy wants people to go back on a fixed rate. That is a very much disputed issue of fact. The plain fact of the matter is they make gobs more money on the variable rate plans. That's right, but don't they give notice? You heard counsel say they give notice. Sure, they give notice, but I don't know about you, but I get letters every day from these ESCO companies, and, you know, you're buried with mail, and they count on the fact that people don't read the notice. You think that's part of their business plan? Absolutely. And this notion that they get much more predictability on fixed rate plans, I don't think that's true at all. They have very sophisticated models where they can predict churn. So they know how many variable customers are going to leave. They know how many fixed customers are going to leave. They do things to reduce churn. I don't want to get into material that's sealed, but they do things to reduce customer churn. Well, they say they do. The point is that churn is a finite number. Everyone knows what it is. It's the same month after month after month, and they plan that into their process, and they plan that into their variable rates. And the plain fact of the matter is they make a whole lot more money on the variable rates than the fixed rates, and uniquely the variable rate never, ever, ever goes below the fixed rate. So how can it be a variable rate? A variable rate is sometimes it's higher than the fixed rate, sometimes it's lower than the fixed rate. With direct energy, it's always higher. You know, I think ---- Counsel, are you counting on the language I read before, that CUTPA protects even the unthinking, ignorant, and credulous consumer? Is that what we're doing here? It protects. Yes, because it's not a subjective test. It's an objective test. So CUTPA focuses on whether something is likely to deceive. That's the language of the court. So it's focusing on a reasonable person, not every single person in a subjective ---- But even the person that doesn't read their mail carefully. Absolutely. And the same thing is contract law. You know, you're bound by a contract if you don't read it, you know, because it's an objective test. And so what somebody actually personally does, we don't think really matters. I mean, that's how you have contract class actions. If you had to drill down into what each person thought or did, you could never get a class action. And so that's why it is objective. CUTPA is objective. Contract law is objective. And here, as the judge said, no reasonable consumer would sign up for one of these things if they thought they could never get below the fixed rate. And that's exactly what's happened here. Thank you. Thank you. Thank you both.